UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Dominique Slayton
                    Plaintiff,                  Case No. 17-13875
v.
                                                Paul D. Borman
City of River Rouge and Edward Otis             United States District Judge

                    Defendants,                 Elizabeth A. Stafford
and                                             United States Magistrate Judge

City of Wyandotte, Brian Zalewski[1],
Benjamin Jones, and Gerald Conz,

                    Defendants.
_____

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 72, 74)

Plaintiff Dominique Slayton filed the instant lawsuit on November 30, 2017

(ECF No. 1, Complaint), alleging that the individual Defendants – Benjamin Jones

and Gerald Conz of the City of Wyandotte Police Department and Edward Otis of

the River Rouge Police Department – violated his Fourth Amendment rights by

using excessive force during the course of his arrest. Plaintiff alleges he was hit and

kicked several times in the head and sides while handcuffed face-down on the ground

following a police vehicle chase, and the Plaintiff's brief swim in the Detroit River

_____

[1] Defendant Zalewski was dismissed from the cause of action by stipulation of the
parties. (ECF No. 92.)

1

on January 2, 2019. Plaintiff also alleges that the municipal defendants City of River Rouge and City of Wyandotte permitted customs, policies, and/or practices that resulted in a violation of his constitutional rights in failing to train and/or supervise their employees.

Defendants City of Wyandotte, Gerald Conz, Benjamin Jones and Brian Zalewski filed a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(b) on April 16, 2020, arguing that Plaintiff is unable to establish a genuine issue of material fact regarding whether the individual defendants directly participated in the alleged misconduct, and that Plaintiff cannot show his alleged injuries were inflicted pursuant to the municipality's official policy or custom. (ECF No. 72.) Defendants City of River Rouge and Edward Otis filed a Motion for Summary Judgment on June 15, 2020, arguing the claim against Officer Otis is barred by qualified immunity because there is no evidence Otis used excessive force and that the force deployed was reasonable and necessary, and also that there is no evidence to support a municipal liability claim. (ECF No. 74.)

## I.  Background

### a.  Plaintiff's Facts

On January 2, 2016, at approximately 9:30 p.m., Dominique Slayton was driving to his mother's house with his girlfriend after dinner with his girlfriend's family in the City of River Rouge. (ECF No. 81-2 Deposition of Dominique Slayton

2

15:10–16:19.) His girlfriend got out of the car due to an argument. After that, Slayton alleges a black SUV cut him off, causing him to swerve to avoid an accident. (*Id.* 22:1–25:25, 104:17–105:3.) Slayton did not notice police lights coming from the black SUV, which he believes was unmarked, until "about half a mile" later. (*Id.* 25:6–15.) Slayton, scared, kept driving and claims he was driving about 40 or 50 miles per hour down Jefferson Avenue before seeing more police lights and pulling into a marina. (*Id.* 27:4–29:25) Slayton parked his car a few feet from the Detroit River. (*Id.* 29:25) He contends that he then climbed on and tripped over a cinderblock divider along the river and fell in the Detroit River. (*Id.* 30:3–31:14.) Slayton maintains that he did not enter the water to get away from the police. (*Id.* 118:4–19:10.)

After entering the water Slayton pulled himself out of the river and sat on the cinderblock divider waiting for police to arrive. He did not injure himself either falling in or climbing out of the river. (*Id.* 31:1–32:12) Slayton maintains that no officer assisted him out of the water.

Slayton says the officers arrived "maybe two minutes later" and the two officers ordered him to get on the ground. Initially, two police cars arrived first and then "a minute or two later like two—two more cars were there." (*Id.* 124:20–25.) It was very dark due to the time of day, and Slayton could not describe in detail the officers who approached him or if they got out of separate cars. (*Id.* 126:18–21.)

3

Slayton began to get down onto his stomach and put his hands behind his back. (*Id.* 32:13–33:2) Slayton alleges that "they were grabbing me and putting me on the ground," and that "he was in the process of [getting on the ground]," when "they threw me to the floor." (*Id.* 125:20–127:20.) Slayton recalls "about four" officers around him when he was handcuffed. (*Id.* 33:4)

At this point, "[t]hey cuffed me and proceeded to kick me in my face twice, kicked me in my sides about four times." (*Id.* 33:7–8.) Slayton is unable to identify exactly which officer(s) handcuffed him or which officer(s) kicked him after he was handcuffed. (*Id.* 133–34.) Slayton also alleges he was on the ground in the handcuffed position for about two minutes. (*Id.* 128:11–13.)

According to Slayton's deposition:

> Q. . . . do you know which officer cuffed you?
>
> A. I don't. My face was in ground.
>
> (Slayton Dep. 128:6–7.)
>
> . ***
>
> Q. Do you know which officers kicked you?
>
> A. I believe it was Otis and one of the other officers from Wyandotte, but I'm not sure which one.
>
> Q. And why is it that you think Officer Otis kicked or hit you?
>
> A. He was on my front side where my head was
>
> Q What did he look like?
>
> A. Bald head, brown skin

\*\*\*

Q. Was he African American?

A. Yes.

Q. All right. And the other officer, do you remember what that officer looked like?

A. He was Caucasian and tall.

(*Id*. 33:9–34:7)

\*\*\*

Q. And we know there was at least two, if not three, other white officers that were close enough to you to be able to kick you, right?

A. Yes.

(*Id*. 159:6–9)

\*\*\*

Q. So as you sit here today do you believe there had to have been more than one, if not two, if not three, and maybe four officers who kicked you?

A. Yes.

Q. Okay. If there's testimony that these officers were close enough to handcuff you and arrest you, you believe those would be the officers who kicked you, right?

A. Yes

(*Id*. 160:3–11.)

Slayton alleges he was then picked up by the back of his shirt, his sides, and legs and taken to Otis' SUV patrol car and driven to the River Rouge police station by Otis. When Slayton got the police station, he had a visibly black and swollen right eye. Slayton alleges injuries including a nasal fracture which required surgery, bruising and pain in his torso, a chipped tooth, and psychological injuries. (ECF No.

81 PageID.1267–68 citing Beaumont Grosse Point Medical Records (ECF No. 81-21 PageID. 1488); Dr. Osgood's Medical Records (ECF No. 81-22 PageID.1498)).

In his Response to the Motion to Dismiss, Plaintiff attaches and relies on a police report about this incident prepared by Sgt. Dotson of the River Rouge police department. (ECF No. 81-7 PageID.1386.) This report cannot be relied upon at this summary judgment stage. Evidence submitted in opposition to summary judgment must be admissible at trial. *Alpert v. United States,* 481 F.3d 404, 409 (6th Cir. 2007).  According to Fed. R. Civ. P 56(c)(4), any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *See, e.g., Brady v. City of Westland*, 1 F. Supp. 3d 729, 736 (E.D. Mich. 2014). In order to fall under the public records exception to hearsay, Fed. R. Evid. 803(8), the report must be based on an officer's firsthand observations. *See Dortch v. Fowler,* 588 F.3d 396, 402–04 (6th Cir. 2009). Because this report was not prepared by Officer Otis, who had firsthand knowledge, but was prepared by Sgt. Dotson, who was not at the scene, it cannot be relied upon at this stage.

### b. Defendants' Facts

Defendants argue that "[t]he police audio and dispatch recordings contradict every aspect of Plaintiff's testimony." (ECF No. 74 PageID.817.) After Officer Otis was dispatched to investigate a gray vehicle driving recklessly, Otis pursued the

vehicle for more than 10 minutes and over nearly eight miles. (ECF No. 74 PageID 817, citing Dispatch Audio) Defendants argue that Plaintiff drove recklessly, traveling the wrong way on streets at a high rate of speed, disregarding stop signs and police sirens. (*Id*.) Defendants also report that only after the chase had begun did Slayton stop to allow the female passenger to exit. (*Id*.) Slayton then continued to drive, at times in excess of 70 miles per hour, before he pulled into the Silver Shores Marina parking lot and exited the vehicle on foot. (ECF No 74 PageID. 819.)

The dispatch audio confirms Defendants' account of an extended police chase through multiple jurisdictions, and that Plaintiff's girlfriend exited the car after the chase had already begun. (Dispatch Audio, ECF No. 74-3.) The audio recordings do not provide information regarding what happened between the Plaintiff and Defendant Officers during the arrest.

Defendants Jones and Conz (Wyandotte) claim when they reached the river, Plaintiff was still in the water. They asked for Plaintiff's hands, he refused, and then they grabbed him by his shirt and pulled him out of the water. Defendants claim Plaintiff began to resist attempts to handcuff him when he was on the ground. Plaintiff placed his left arm under him and started struggling and flailing his legs. (ECF No. 81-4, Deposition of Benjamin Jones 10:6–21.) Officer Conz pulled out a taser, which Plaintiff kicked out of his hand (*Id*. 8:7–9:13.) Officers from Ecorse and/or River Rouge assisted in the struggle and in handcuffing plaintiff, although

Jones and Conz cannot identify who may have helped. (ECF No. 81-3, Deposition of Gerald Conz. 15:9–16:13.) Both officers deny kicking or hitting the Plaintiff, and do not know how he obtained his injuries. (Jones Dep.17:9–11; Conz Dep. 31:12–14.)

Officer Otis (River Rouge) testified that he initiated the vehicular pursuit of Plaintiff but fell back when Plaintiff's vehicle left River Rouge and entered the other municipalities. (ECF No. 81-5, Deposition of Edward Otis 13:17–14:8.) When Plaintiff's vehicle stopped in the marina, Otis circled around to the opposite entrance, parked in the lot and walked to the river. (*Id*. 22:2–25.) Otis reports that there were two to four other squad cars at the marina by the time he arrived. (*Id*. 15:15–22; 22:2–13.) He did not assist in handcuffing Plaintiff and that there were four or five officers standing around him when he was handcuffed. Otis is similarly unaware if anyone kicked, punched, or hit Plaintiff, but saw the other officers remove Plaintiff from the water and saw his arms and legs moving in the struggle to handcuff him. (*Id*. 23:1–27:3). Otis admits to transporting Plaintiff in his vehicle to the police station but does not recall transporting Plaintiff from his position on the ground to the police vehicle. (*Id*. 27:4–11.)

## II.   Standard of Review

Summary judgment will be granted when no genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The moving party bears the initial burden of establishing that there are no genuine issues of material facts, which it may accomplish by demonstrating that the nonmoving party lacks evidence to support an essential element of its case." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (quotations omitted). If the movant satisfies this burden, the non-moving party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

## III.   Analysis

### a.  Qualified Immunity for Individual Defendants

Defendants argue that the Plaintiff cannot show that any of the named officers were personally involved in any excessive force. Defendant Otis also argues that the force used was reasonable and necessary.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.' " *Elder v. Holloway,* 510 U.S. 510, 514 (1994) (quoting *Harlow,* 457 U.S. at 806).

In reviewing qualified-immunity claims, a district court must determine: 1) "whether '[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right' "; and 2) whether that right was clearly established at the time of the alleged violation. *Binay v. Bettendorf,* 601 F.3d 640, 646 (6th Cir. 2010) (alterations in original) (citation omitted); *see also Saucier v. Katz,* 533 U.S. 194, 201 (2001). Courts may address these questions out of sequence. *Pearson v. Callahan,* 555 U.S. 223 (2009). A right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Binay,* 601 F.3d at 646–47. At this stage, the plaintiff must, at a minimum, offer sufficient evidence to create a "genuine issue of fact," that is, "evidence on which [a] jury could reasonably find for the plaintiff." *Thompson v. City of Lebanon,*

*Tennessee,* 831 F.3d 366, 369–70 (6th Cir. 2016) citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 256 (1986).

The Fourth Amendment prohibits officers from using excessive force in the course of making an arrest. *Graham v. Connor,* 490 U.S. 386, 394–95 (1989). "To determine whether a constitutional violation based on excessive force has occurred, this Court applies 'the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight.' " *Binay,* 601 F.3d at 647 (quoting *Fox v. DeSoto,* 489 F.3d 227, 236 (6th Cir.2007)). Factors relevant to the reasonableness inquiry include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396.

The reasonableness of an officer' actions are analyzed in segments. *Dickerson v. McClellan,* 101 F.3d 1151, 1161–62 (6th Cir. 1996). For this Court's analysis, the relevant timeframe is the moment of the alleged constitutional violation: while Plaintiff was handcuffed face-down on the ground and alleges he was kicked in face twice and sides "about four times." Defendants do not argue that Plaintiff continued to resist or fight back after he was handcuffed, although they do contend he resisted during the handcuffing process.

11

### i. Objective Reasonableness

Defendant Otis argues that the force used was reasonable and necessary, citing cases where the use of some amount of force was justified by a plaintiff's fleeing or resisting arrest. *See Dunn v. Matatall*, 549 F. 3d 348 (6th Cir. 2008); *Carter v. Carter*, 728 Fed. Appx. 419, 422–23 (6th Cir. 2018). The cases cited are unpersuasive. In the present case, unlike the cited cases, the force in question was used after the Plaintiff was already subdued, and Defendants do not argue he was resisting arrest at that time.

Using force against a subdued, handcuffed subject is excessive and it is clearly established that this violates the Fourth Amendment. *See e.g*., *Bultema v. Benzie County,* 146 Fed. App'x. 28, 35 (6th Cir. 2005) (it is clearly established in this Circuit that "the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional.") (citations omitted); *Phelps v. Coy*, 286 F.3d 295, 301–02 (6th Cir. 2002) (holding that no reasonable officer would strike a handcuffed arrestee in the head); *McDowell v. Rogers,* 863 F.2d 1302, 1307 (6th Cir. 1988) (holding that a "totally gratuitous blow with a policeman's nightstick" to a handcuffed, unresisting suspect was constitutionally unreasonable). Even assuming that it would have been reasonable to use some amount of force to subdue Slayton and place him in handcuffs, the alleged use of excessive force did not take place until Slayton was subdued, face-down and in handcuffs.

Defendants also argue that Plaintiff should be estopped from denying that he resisted arrest. Defendant Otis argues that because Plaintiff plead guilty in State Court to resisting arrest, "[h]e cannot now contend that he did not intentionally evade arrest and/or physically resist the officers' attempts to secure him in handcuffs." (ECF No. 74 PageID.836.)   Notably, Plaintiff's deposition testimony does not acknowledge resisting arrest, a charge to which he pled guilty in Wayne County Circuit Court. (Plea Hearing Transcript, ECF No. 72-3.) Despite Plaintiff's guilty plea, Defendant is pointing away from the time of the post-handcuffing alleged constitutional violation.

Viewing the facts most favorably to the Plaintiff, as is required of this Court, a jury could reasonably find that it was objectively unreasonable to kick or hit the Plaintiff while he was handcuffed face-down on the ground.

### ii.  Individual Officer Liability

To survive summary judgment, Plaintiff must also show that each officer was personally involved in the constitutional violation. In a § 1983 action, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay,* 601 F.3d at 650 (6th Cir. 2010); *see also Dorsey v. Barber,* 517 F.3d 389, 399 (6th Cir. 2008) (remarking that district court should have "distinguish[ed] between the actions of [defendant police officers]" instead of "lump[ing] them together" for purposes of the qualified-immunity analysis in excessive-force case).

Each individual Defendant argues that Plaintiff cannot show that they were personally involved in any use of excessive force.

To avoid summary judgment of his claims against each individual officer, Plaintiff must show more than "mere presence at the scene." *Binay*, 601 F.3d at 650 (6th Cir. 2010). Instead, he must show "that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Id.* (quotation marks omitted). Under the third prong, "a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Plaintiff argues that the fact that he cannot identify exactly which officer applied which instance of force does not preclude his relief. Courts in the Sixth Circuit have refused to grant summary judgment to defendant police officers where a plaintiff is "unable to pinpoint precisely which named defendant did what, even where the defendants did not intentionally conceal their identities." *Fazica v. Jordan*, 926 F.3d 283, 293 (6th Cir. 2019). That decision noted the policy implications of such a rule: "Plaintiffs who are unable to pinpoint precisely which named defendant

14

did what, even where the defendants did not intentionally conceal their identities, still have an interest in the vindication of their constitutional rights." *Id.*

The Sixth Circuit court in *Fazica* surveyed prior cases in this Circuit and laid out the factual scenario and showing a plaintiff must make to fall into this category of cases: "[W]here a plaintiff who was unable to identify clearly which officers committed specific acts during the incident produces evidence that places an individual defendant in a small group of officers that committed allegedly unconstitutional acts within each other's presence, the plaintiff's claim against that defendant may survive summary judgment." *Id.*, at 292. The court in *Fazica* noted that this rule applies to a limited set of cases, but the rule recognizes that an officer need not personally apply excessive force to have committed a constitutional violation. "First, it applies only to a limited set of plaintiffs: those who can identify the small team of officers who potentially used excessive force against the plaintiff in each other's presence. Second, it *does* require evidence that each particular defendant committed a specific constitutional violation. It acknowledges, however, that specific constitutional violations can be committed not only by an officer personally applying excessive force, but also by an officer witnessing excessive force and neglecting his duty to intervene." *Id.*

Although there is no requirement for officers to have intentionally concealed their identity, another court in the Sixth Circuit identified a possible limitation. In

*Pineda,* the court noted that Sixth Circuit courts have "applied *Fazica*'s rule only when "circumstances beyond [the plaintiff's] control" made the plaintiff "unable" to learn the identity of the defendants who violated the plaintiff's constitutional rights. *Pineda v. Hamilton Cty., Ohio*, 977 F.3d 483, 493-94 (6th Cir. 2020) citing *Batson v. Hoover*, 788 F. App'x 1017, 1020 (6th Cir. 2019).

These principles were seen in *Pershell v. Cook,* which affirmed the denial of qualified immunity to three police officers alleged to have used excessive force during an arrest. 430 F. App'x 410, 416 (6th Cir. 2011). The court recognized that during the alleged excessive force against the plaintiff, the plaintiff was unable to see the officers standing above and behind him at the precise moment of constitutional violation because he was facedown and had his glasses removed. *Id.* The plaintiff provided an account of the location and conduct of the officers based on his sensory observations. The court reasoned that this information, along with the officer accounts of the incident, would provide a jury with sufficient information to determine the liability of each individual defendant for the alleged constitutional violation. *Id.*

Here, to survive summary judgment, Plaintiff must both "identify the small team of officers who potentially used excessive force against the plaintiff in each other's presence" and identify "circumstances beyond his control that made Plaintiff

unable to identify which officer committed exactly which alleged constitutional violation." *Pineda*, 977 F.3d at 493-94 (6th Cir. 2020).

Plaintiff has identified a small group of officers who allegedly committed unconstitutional acts within each other's presence: Officers Jones, Conz, and Otis. Plaintiff names these officers as the officers next to him while he was handcuffed face-down and argues they each therefore either participated in or observed the excessive force and had the opportunity and means to prevent the harm from occurring. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); (ECF No. 81 PageID. 1279.) Although Plaintiff did not see which officer committed which specific act, he was able to provide some descriptive features of the officers, including identifying the officer standing near his head as "bald" with "brown skin" and another officer as "Caucasian and tall." (Slayton Dep. 33:9–34:7.)

The record confirms that Defendants Jones and Conz were involved in the struggle with and arrest of the Plaintiff and were directly next to the Plaintiff when he alleges that he was kicked in the face and sides several times. As for Defendant Otis, the record evidence viewed most favorably to the nonmoving Plaintiff places Otis next to Plaintiff's head when he alleges he was kicked in the head and sides. Plaintiff testified that Otis was next to his head when he was kicked, identifying him as African American and bald. (Slayton Dep. 33:9–34:5.) Otis, on the other hand, emphasizes record evidence showing that he was not involved in the struggle

to handcuff the Plaintiff. In his testimony, Otis testified that when he pulled up in the marina, he was "maybe 20 to 50 feet away from where they were," and was able to describe Plaintiff's extraction from the river and the struggle to handcuff Slayton in some detail. (Otis Dep. 22:2–12.) Defendant Jones testified that he did not know whether Otis was involved in handcuffing the Plaintiff (Jones Dep. 12:25–14:3), while Conz testified that Officer Otis was not near Slayton during the handcuffing, but "was coming up to the scene where we were handcuffing him" and arrived after the handcuffs were on. (Conz Dep. 16:14–17:14.) Despite Defendant Otis' arguments, the record facts viewed most favorably to the Plaintiff do not foreclose Plaintiff's version of events – that Otis was next to his head while he was handcuffed face-down.

Defendants argue that Plaintiff has not identified a small group of officers working together to restrain plaintiff and attempt to distinguish the instant case from *Fazica* and *Pershell*. Instead of the discrete teams of officers involved in those cases, here there were "more than nine officers from three different jurisdictions involved," and that "the officers arrived from different directions at different times and were not all involved in the physical restraint of the Plaintiff." (ECF No. 83 PageID.1846.)

Defendants' argument is unpersuasive, as they do not point to any record evidence identifying any other officer who was in position to either participate in or observe the excessive force. Jones and Conz testified that there were Ecorse

18

officers who assisted in handcuffing plaintiff but are unable to name any officer. Otis testified that there were "four or five" officers surrounding Slayton when he was removed from the river and handcuffed. Defendants do not identify who these officers may have been. Defendants also claim there were Michigan State troopers on the scene, but there is no evidence presented showing Michigan State troopers played any role in the events.

The record facts, viewed most favorably to the Plaintiff, place only the three named Defendants in a small group of officers next to the Plaintiff at the moment of the alleged constitutional violation. Plaintiff provides sufficient information about the location and conduct of the officers based on his limited sensory observations. This, along with the officer accounts of the incident will provide a jury with sufficient information to determine the liability of each of each individual Defendant.

Plaintiff also sufficiently identifies circumstances beyond his control that made him unable to identify which officer committed exactly which act of excessive force. Plaintiff alleges he was handcuffed face-down on the ground when he was kicked by the officers. It was after 9 p.m. in a dark parking lot. These circumstances are comparable to those considered sufficient in *Pershell* (facedown and glasses removed). 430 F. App'x at 416 (6th Cir. 2011).

Defendants have failed to show a lack of outstanding material facts as to whether officers Jones, Conz, and Otis either participated in the alleged constitutional violation or were in a position to observe the violation and had the means to prevent the harm from occurring. Defendants Jones, Conz and Otis are not entitled to qualified immunity. Summary Judgment for the individual Defendants is DENIED.

### b. Municipal Liability

Count II of Plaintiff's Complaint alleges constitutional violations against the City of River Rouge and City of Wyandotte for a failure to adequately train and/or supervise officers. (ECF No. 1, ¶¶ 32–37.) *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "To succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's rights." *Miller v. Sanilac Cty.*, 606 F.3d 240, 254–55 (6th Cir. 2010).   A   plaintiff may demonstrate such a policy or custom by showing that the municipality's training of its police officers was so inadequate that its "failure to train amounts to *deliberate indifference* to the rights of the persons with whom the police come into contact." *Id.* (quotation omitted) (emphasis in original). "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on

notice that the training in this particular area was deficient and likely to cause injury." *Id.* (quotation omitted).

Against the City of Wyandotte, Plaintiff alleges that the City did not conduct any kind of performance evaluations of their police officers after their initial training stage, and for some officers this has been several years. Specifically, Defendant Conz did not receive any use of force training within ten years prior to the incident in question. (ECF No. 81-20, Conz's Training Records.)

Against the City of River Rouge, Plaintiff alleges that the City did not conduct any kind of performance evaluations of their police officers after their initial training stage, and for some officers this has been several years. Specifically, Plaintiff alleges that Defendant Otis had not received any use of force training within 10 years prior to the incident in question. (ECF No. 82-24, Otis' Training Records.) Plaintiff also points to Otis' disciplinary record, which according to Plaintiff shows "a long history of unruly behavior toward both the public and his fellow officers . . . ." (ECF No. 82 PageID.1536; ECF No 82-25, Otis Disciplinary Records.)

"To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir.

2010) A showing that a municipality failed to conduct performance evaluations "alone is not enough to show deliberate indifference, especially in the absence of evidence of a pattern of excessive force, a record of officers going unpunished for excessive force, or other circumstances tending to show that [the City] was aware or could have been aware that [the Defendants were] prone to unwarranted application of force." *Amerson v. Waterford Twp.*, 562 Fed. Appx. 484, 492 (6th Cir.2014); *See also Acklin v. City of Inkster*, 93 F. Supp. 3d 778, 797 (E.D. Mich. 2015).

Regarding the City of Wyandotte, there is no evidence put forth showing "deliberate indifference." Plaintiff does not show any pattern of excessive force, that the City was on notice of Defendants Jones or Conz ever using excessive force, or that the City failed to respond properly. Failure to conduct performance evaluations is not enough to show deliberate indifference.

Regarding the City of River Rouge, Plaintiff has not "show[n] prior instances of unconstitutional conduct demonstrating that the [city] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010). Otis' disciplinary history of "unruly behavior" does not include any allegations of violence. The facts presented do not demonstrate deliberate indifference and do not identify a pattern of excessive force or any other

22

constitutional violation, or that the alleged violation in question is a highly predictable consequence of the failure to train.

Summary judgment in favor of the City of Wyandotte and the City of River Rouge as to the municipal liability claims is GRANTED.

Assessment of attorney fees is improper at this stage of the litigation and will not be considered at this time.

SO ORDERED.


Dated: January 27, 2021                     s/Paul D. Borman

                                            Paul D. Borman
                                            United States District Judge